UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF TENNESSEE
AT CHATTANOOGA

| | |
|---|---|
| EXPRESS SCRIPTS, INC. and PRIORITY HEALTHCARE DISTRIBUTION, INC. d/b/a CURASCRIPT SD SPECIALTY DISTRIBUTION, <br><br>Plaintiffs,<br><br>v.<br><br>WILLIAM R. KINCAID, M.D., MILLARD R. LAMB, M.D., AND CHARLES O. FAMOYIN, M.D.,<br><br>Defendants. | Case No. _____<br><br>NON-JURY |

## COMPLAINT

Plaintiffs, Express Scripts, Inc. and Priority Healthcare Distribution, Inc. d/b/a CuraScript SD Specialty Distribution (collectively, "PHD" or "Plaintiffs"), through counsel, and for its Complaint against Defendants, William R. Kincaid, M.D., Millard R. Lamb, M.D., and Charles O. Famoyin, M.D. (collectively, the "Defendants") complains and alleges as follows:

## PARTIES AND JURISDICTION

1. Express Scripts, Inc. is Delaware Corporation with its principal place of business located at One Express Way, St. Louis, Missouri 63121.

2. Priority Healthcare Distribution, Inc. d/b/a CuraScript SD Specialty Distribution is a Florida corporation with its principal place of business located at 2297 Southwest Boulevard, Suite D, Grove City, Ohio 43123.

3. Defendant, William R. Kincaid, M.D. ("Kincaid"), is an individual citizen and resident of Washington County, Tennessee. At all times material and pertinent herein, Defendant Kincaid was a member and manager of East Tennessee Hematology Oncology Associates P.C. d/b/a McLeod Cancer and Blood Center ("McLeod Cancer Center").

4. Defendant, Millard R. Lamb, M.D. ("Lamb"), is an individual citizen and resident of Washington County, Tennessee. At all times material and pertinent herein, Defendant Lamb was a member and manager of McLeod Cancer Center.

5. Defendant, Charles O. Famoyin, M.D. ("Famoyin"), is an individual citizen and resident of Washington County, Tennessee. At all times material and pertinent herein, Defendant Kincaid was a member and manager of McLeod Cancer Center.

6. This Court has subject matter jurisdiction over this matter pursuant to 28 U.S.C. § 1332, in that the parties have complete diversity of citizenship and the amount in controversy exceeds $75,000.00 exclusive of interest and costs.

7. This Court has personal jurisdiction over the Defendants in that the Defendants can be found within this district and have transacted business in the State of Tennessee.

8. Venue is proper pursuant to 28 U.S.C. § 1391 because all Defendants reside in this district and the acts giving rise to this action occurred in this district.

## BACKGROUND

### Agreement Between PHD and McLeod Cancer Center

9. PHD repeats, realleges, and incorporates herein by reference each and every allegation set forth in paragraphs 1 through 8 above as if fully set forth herein.

10. On or about September 29, 2011, McLeod Cancer Center entered into a Credit Application (the "Agreement") with PHD to purchase certain medications. A copy of the Agreement is attached hereto as **Exhibit A** and incorporated herein by this reference.

11. The Agreement provides, in part:

This application is submitted to Priority Healthcare Distribution Inc. doing business as CuraScript SD Specialty Distribution (hereinafter referred to as CSD) for the purpose of obtaining commercial credit. The undersigned represents and warrants that all information herein is current, correct and complete, and that CSD may rely on such information in deciding to extend or discontinue credit. The undersigned agrees to notify CSD immediately in writing of any change in the foregoing information including, without limitation, any change in the nature of business, ownership, name or location of the business or financial condition of the undersigned. The undersigned agrees to furnish current financial information from time to time as requested by CSD.

12. The Agreement provides, in part:

The undersigned agrees that in the event such debts, accounts or invoices are not paid when due, they will accrue late charges at the rate of eighteen percent (18%) per annum or the maximum rate allowed by law, whichever is the lesser rate. CSD reserves the right to apply any and all past-due moneys however it deems appropriate.

13. The Agreement provides, in part:

Please complete the name of the entity on behalf of which this credit application is being submitted, print your full name, title/position, date, and sign in your official capacity on behalf of the entity.

14. The Company Information section on page 1 of the Agreement indicates the 'Name on the State License' was Millard Ray Lamb, MD, i.e. Defendant Lamb.

15. The Agreement was executed by McLeod Cancer Center's business manager, Michael Combs, as authorized agent for Defendant Kincaid.

16. The Agreement was for the extension of credit and for the sale/purchase of pharmaceutical drugs to be provided by or on behalf of PHD pursuant to individual orders placed

by and on behalf of the McLeod Cancer Center for pharmaceutical drugs for patients of McLeod Cancer Center and/or Defendants Kincaid, Lamb, and Famoyin.

17. Pursuant to the Agreement, PHD delivered pharmaceutical drugs in several shipments over time.

18. Beginning on or about June 8, 2012, PHD made a total of two hundred and twelve (212) shipments of pharmaceutical drugs, all of which were accepted, and PHD issued corresponding invoices for each shipment with payment due thirty (30) or more days after delivery. The last such invoice was issued to McLeod Cancer Center on or about October 31, 2012.

19. A true and correct copy of Plaintiffs' summary of the orders, shipments, invoice amounts, and invoice dates for the pharmaceutical drugs delivered and sold is attached hereto as **Exhibit B** and incorporated herein by this reference.

20. The invoices reflect that all shipments of the pharmaceutical drugs were billed to McLeod Cancer Center.

21. The invoices reflect that all shipments of the pharmaceutical drugs were shipped to:

> MILLARD RAY LAMB, MD
> EAST TN HEM/ONCOLOGY DBA
> 310 N ST OF FRANKLIN RD #401
> JOHNSON CITY, TN 37604

22. Defendant McLeod Cancer Center accepted every such shipment of the pharmaceutical drugs without dispute.

23. The Agreement provides for reimbursement of attorney's fees, court costs, or collection agency fees that may be incurred in efforts to collect past-due amounts.

**The Fraudulent Scheme Operated Through McLeod Cancer Center**

24. The pharmaceutical drugs purchased from PHD were prescribed by Defendants Kincaid, Lamb, and Famoyin and were administered and dispensed through McLeod Cancer Center.

25. At all times material, Defendants Kincaid, Lamb, and Famoyin were Medical Doctors licensed and practicing medicine in the State of Tennessee.

26. At all times material, Defendants Kincaid, Lamb, and Famoyin were employees of McLeod Cancer Center.

27. At all times material, Defendants Kincaid, Lamb, and Famoyin were shareholders of McLeod Cancer Center.

28. At all times material, Defendants Kincaid, Lamb, and Famoyin were the majority shareholders of McLeod Cancer Center.

29. At all times material, Defendant Kincaid was the president, managing partner, and the majority owner of McLeod Cancer Center.

30. At all times material, Defendants Lamb and Famoyin were the minority owners of McLeod Cancer Center.

31. Reimbursement for the drugs and their administration was sought from the Medicare and Medicaid ("TennCare") programs, as well as other health benefits programs.

32. Quality Specialty Products ("QSP") was a business in Winnipeg, Canada, offering for sale to physicians and other health care providers in the United States, drugs which had been obtained from foreign sources and which had not been approved by the U.S. Food and Drug Administration (the "FDA") for distribution or use in the United States.

33. Upon information and belief, in September 2007, Defendant Lamb received a fax mailer from QSP which offered for sale certain prescription drugs, including chemotherapy drugs, along with price information for the drugs, the prices being less than what McLeod Cancer Center had been paying to purchase the drugs from FDA-approved sources in the United States.

34. Upon information and belief, during portions of time between 2007 through 2012, Defendants Kincaid, Lamb, and Famoyin ordered drugs from QSP and QSP began shipping misbranded unapproved drugs to McLeod Cancer Center, where the drugs were administered to patients and claims for reimbursement were submitted to Medicare, TennCare, and other health benefits programs (the "Fraudulent Scheme").

35. Upon information and belief, during the same time period time period, Defendants Kincaid, Lamb, and Famoyin directed employees of McLeod Cancer Center to place the orders with QSP.

36. Thus, in September 2007, Defendants Kincaid, Lamb, and Famoyin began using McLeod Cancer Center for fraudulent purposes.

37. Upon information and belief, the drugs provided by QSP to McLeod Cancer Center were drugs from foreign sources that were not inspected and approved by the FDA, and included drugs which had been distributed in Turkey, India, the European Union, and elsewhere.

38. Upon information and belief, in August 2009, in furtherance of their Fraudulent Scheme and to prevent the nurses at the McLeod Cancer Center from learning Defendants Kincaid, Lamb, and Famoyin were purchasing and using unapproved foreign drugs, Defendant Kincaid directed an employee of McLeod Cancer Center to have the drugs shipped to a storage business in Johnson City, [STATE?], which Defendant Kincaid owned.

DocID: 4836-9425-5480.7
Case 1:19-cv-00007-JRG-SKL   Document 1   Filed 01/09/19   Page 6 of 17   PageID #: 6

6

39. Upon information and belief, the unapproved foreign drugs, after having been received at the storage business, were transported to McLeod Cancer Center and then placed by a pharmacy technician into McLeod Cancer Center's drug storage and control system where the misbranded drugs were mingled with FDA-approved drugs from legitimate sources.

40. From approximately September 2007 to early 2008, and from August 2009 to February 2012, Defendants Kincaid, Lamb, and Famoyin, using McLeod Cancer Center's corporate form, pursuant to the Fraudulent Scheme purchased over $2 million in misbranded, unapproved foreign drugs, provided those drugs to their patients, and billed Medicare, TennCare, and other health benefits programs approximately $2.3 million for the unapproved foreign drugs.

41. The Fraudulent Scheme violated applicable United States Federal and Tennessee state law.

### Fraud by the Defendants as to the Agreement and PHD

42. Upon information and belief, after learning they were being investigated by the Federal Bureau of Investigation ("FBI"), Defendants Kincaid, Lamb, and Famoyin used the McLeod Cancer Center's corporate form for fraudulent purposes by having McLeod Cancer Center enter into the Agreement with PHD in order to receive expensive prescription drugs on credit that Defendants Kincaid, Lamb, and Famoyin prescribed to their patients and for which the Defendants Kincaid, Lamb, and Famoyin derived personal income and profits, which they intended and did use to towards settlement of civil claims under the False Claims Act for false and fraudulent claims for reimbursements submitted to Medicare and TennCare programs for unapproved drugs.

43. Defendants Kincaid, Lamb, and Famoyin used the McLeod Cancer Center's corporate form to order drugs knowing that they would not pay for them.

44. Defendants Kincaid, Lamb, and Famoyin had no intention of or the ability to pay PHD for the pharmaceutical drugs at the time Defendants Kincaid, Lamb, and Famoyin placed orders or directed their agents and employees to place orders with PHD.

45. McLeod Cancer Center failed to pay its invoices in a timely manner and began accruing debt to PHD, including principal and interest.

46. McLeod Cancer Center failed to pay a principal balance of $1,954,067.67, plus interest and any and all applicable late charges and/or other fees/expenses pursuant to the parties' Agreement.

47. Upon information and belief, during the period from June 2012 through October 2012 while the McLeod Cancer Center was ordering and obtaining the prescription drugs on credit, the Defendants, Kincaid, Lamb, and Famoyin were depleting McLeod Cancer Center's assets for their personal benefit, which caused McLeod Cancer Center to be able to continue to operate even though it could no longer pay its debts during that same time period.

48. On or about August 22, 2012, the business manager of McLeod Cancer Center, Michael Combs, entered into a criminal plea agreement wherein he admitted his role in the Fraudulent Scheme, including ordering pharmaceutical drugs from QSP at the direction of Defendants Kincaid, Lamb, and Famoyin.

49. McLeod Cancer Center closed shortly thereafter in November 2012.

50. The Fraudulent Scheme directly or indirectly led to the closure of McLeod Cancer Center.

51. The Fraudulent Scheme directly or indirectly led to the failure of McLeod Cancer Center to meet its monetary obligations to Plaintiffs under the Agreement.

52. As a direct result of the Fraudulent Scheme, Kincaid agreed to pay $2.55 million in fines for false claims submitted to Medicare and TennCare programs.

53. As a direct result of the Fraudulent Scheme, Lamb agreed to pay $850,000 in fines for false claims submitted to Medicare and TennCare programs.

54. As a direct result of the Fraudulent Scheme, Famoyin agreed to pay $850,000 in fines for false claims submitted to Medicare and TennCare programs.

55. On November 15, 2012, the United States Department of Justice (the "USAO") indicted Defendant Kincaid in the District Court for the Eastern District of Tennessee, Greenville, Tennessee (the "Criminal Court") in Case No. 12-cr-00116-JRG-DHI (the "Kincaid Criminal Case").

56. The USAO and Kincaid entered into a *Plea Agreement* [Docket No. 2] (the "Kincaid Plea Agreement") on November 15, 2012. A copy of the Kincaid Plea Agreement is attached hereto as **Exhibit C** and incorporated herein by this reference.

57. The Kincaid Plea Agreement was acknowledged and signed by Kincaid and his criminal attorney retained in the Kincaid Criminal Case.

58. The Kincaid Plea Agreement "agrees and stipulates to" facts that acknowledge and confirm that Kincaid participated in the Fraudulent Scheme. *See* Kincaid Plea Agreement ¶ 4.

59. The Kincaid Plea Agreement "agrees and stipulates to" facts that acknowledge and confirm Lamb and Famoyin's participation in the Fraudulent Scheme. *See* Id.

60. Kincaid was convicted and sentenced pursuant to the evidence stipulated to in the Kincaid Plea Agreement for one (1) count of "receiving in interstate commerce a misbranded

drug with intent to defraud or mislead in violation of 21 U.S.C. § 33l(c)".[1] *See* Kincaid Plea Agreement ¶ 1(a).

61. On February 20, 2013, PHD filed a Complaint against McLeod Cancer Center and Kincaid, Lamb, and Famoyin, in their individual capacities, in the 18th Judicial Circuit in Seminole County, Florida Case No.: 13-CA-899-15-K, which was captioned *Express Scripts, Inc., et al. v. East Tennessee Hematology Oncology Associates P.C. d/b/a McLeod Cancer and Blood Center and William R. Kincaid, M.D., Millard R. Lamb, M.D., and Charles O. Famoyin, M.D.* (the "Florida Litigation").

62. Pursuant to the Florida Litigation, PHD sought to recover damages with respect to Defendants' alleged breach the Agreement entered into between PHD and McLeod Cancer Center, fraud in the inducement as to Kincaid, Lamb, and Famoyin, and unjust enrichment as to Kincaid, Lamb, and Famoyin.

63. On September 25, 2017, that certain *Consent Judgment as to Defendant East Tennessee Hematology Oncology Associates PC* was entered in the Florida Litigation against McLeod Cancer Center in the amount of $5,136,142.03, plus post judgment interest at the maximum rate allowed by law (the "Consent Judgment"). A true and correct copy of the Consent Judgment is attached hereto as **Exhibit D** and incorporated herein by this reference.

64. On May 2, 2018, PHD filed its *Complaint to Domesticate Judgment* in the Chancery Court for Washington County, Tennessee, Case No. 18-CV-236, which was captioned

---

[1] The relevant portion of 21 U.S.C. § 331 states as follows:

> The following acts and the causing thereof are prohibited:
> ….
> (c) The receipt in interstate commerce of any food, drug, device, tobacco product, or cosmetic that is adulterated or misbranded, and the delivery or proffered delivery thereof for pay or otherwise"

*Express Scripts, Inc., et al. v. East Tennessee Hematology Oncology Associates P.C. d/b/a McLeod Cancer and Blood Center and William R. Kincaid, M.D., Millard R. Lamb, M.D., and Charles O. Famoyin, M.D.* (the "Tennessee Domestication Case"). In the Tennessee Domestication Case, PHD sought to domesticate the Consent Judgment in Tennessee.

65. On August 21, 2018, the Chancery Court for Washington County, Tennessee entered its *Final Order of Default Judgment* (the "Domestication Judgment") for $5,136,142.03, plus accrued interest in the amount of $245,624.50. A true and correct copy of the Domestication Judgment is attached hereto as **Exhibit E** and incorporated herein by this reference.

66. McLeod Cancer Center has not made any payments to PHD following entry of the Consent Judgment.

67. Upon information and belief, Defendants Kincaid, Lamb, and Famoyin exercised complete control and domination over McLeod Cancer Center, including its finances, policies, and business practices, to such an extent that McLeod Cancer Center did not have a separate existence of its own.

68. Upon information and belief, Defendants Kincaid, Lamb, and Famoyin and McLeod Cancer Center intermingled funds and assets.

69. Upon information and belief, McLeod Cancer Center was inadequately capitalized.

70. Upon information and belief, corporate formalities were not observed by Defendants Kincaid, Lamb, and Famoyin.

# COUNT I
# ALTER EGO

### (Piercing the Corporate Veil - As to Defendant Kincaid)

71. PHD repeats, realleges, and incorporates herein by reference each and every allegation set forth in paragraphs 1 through 70 above as if fully set forth herein.

72. As stipulated in the Kincaid Plea Agreement by Kincaid, Kincaid operated a Fraudulent Scheme through McLeod Cancer Center whereby misbranded unapproved drugs were shipped to McLeod Cancer Center and such drugs were administered to patients and claims for reimbursement were submitted to Medicare, TennCare, and other health benefits programs.

73. McLeod Cancer Center was used by Kincaid as a mere instrumentality to conduct and conceal his illegal and fraudulent activities.

74. On information and belief, McLeod Cancer Center was 100% owned and managed by Kincaid, Lamb, and Famoyin, each of whom participated in the illegal and fraudulent activities through McLeod Cancer Center.

75. On information and belief, McLeod Cancer Center is the "alter ego" of Kincaid and was used in all respects by Kincaid as a shield for his debts and illegal and fraudulent activities.

76. Upon information and belief, Defendants Kincaid, Lamb, and Famoyin exercised complete control and domination over McLeod Cancer Center, including its finances, policies, and business practices, to such an extent that McLeod Cancer Center did not have a separate existence of its own.

77. Upon information and belief, Defendants Kincaid, Lamb, and Famoyin and McLeod Cancer Center intermingled funds and assets.

78. Upon information and belief, McLeod Cancer Center was inadequately capitalized.

79. Upon information and belief, corporate formalities were not observed by Defendants Kincaid, Lamb, and Famoyin.

80. In Kincaid's role as the president, managing partner, and majority owner of McLeod Cancer Center, as described above, he used and abused the corporate form for his own personal benefit.

81. PHD was damaged by Kincaid as the illegal and fraudulent activities of Kincaid, including but not limited to the Fraudulent Scheme, which directly or indirectly caused the closure of McLeod Cancer Center, the fines levied against McLeod Cancer Center and its members, and the failure of McLeod Cancer Center to pay its obligations due under the Agreement.

82. The assets of Kincaid should be considered one and the same with McLeod Cancer Center and Kincaid should be liable to PHD for McLeod Cancer Center's obligations arising from the Agreement.

## COUNT II
## ALTER EGO

**(Piercing the Corporate Veil - As to Defendant Lamb)**

83. PHD repeats, realleges, and incorporates herein by reference each and every allegation set forth in paragraphs 1 through 82 above as if fully set forth herein.

84. Lamb operated a fraudulent scheme through McLeod Cancer Center whereby misbranded unapproved drugs were shipped to McLeod Cancer Center and such drugs were

administered to patients and claims for reimbursement were submitted to Medicare, TennCare, and other health benefits programs.

85. McLeod Cancer Center was used by Lamb as a mere instrumentality to conduct and conceal his illegal and fraudulent activities.

86. On information and belief, McLeod Cancer Center was 100% owned and managed by Kincaid, Lamb, and Famoyin, each of whom participated in the illegal and fraudulent activities through McLeod Cancer Center.

87. On information and belief, McLeod Cancer Center is the "alter ego" of Lamb and was used in all respects by Lamb as a shield for his debts and illegal and fraudulent activities.

88. On information and belief, Defendants Kincaid, Lamb, and Famoyin exercised complete control and domination over McLeod Cancer Center, including its finances, policies, and business practices, to such an extent that McLeod Cancer Center did not have a separate existence of its own.

89. On information and belief, Defendants Kincaid, Lamb, and Famoyin and McLeod Cancer Center intermingled funds and assets.

90. On information and belief, McLeod Cancer Center was inadequately capitalized.

91. On information and belief, corporate formalities were not observed by Defendants Kincaid, Lamb, and Famoyin.

92. In Lamb's role as a minority owner of McLeod Cancer Center, he used and abused the corporate form for his own personal benefit.

93. PHD was damaged by Lamb as the illegal and fraudulent activities of Lamb, including but not limited to the Fraudulent Scheme, which directly or indirectly caused the closure of McLeod Cancer Center, the fines levied against McLeod Cancer Center and its

members, and the failure of McLeod Cancer Center to pay its obligations due under the Agreement.

94. The assets of Lamb should be considered one and the same with McLeod Cancer Center and Lamb should be liable to PHD for McLeod Cancer Center's obligations arising from the Agreement.

## COUNT III
## ALTER EGO

**(Piercing the Corporate Veil - As to Defendant Famoyin)**

95. PHD repeats, realleges, and incorporates herein by reference each and every allegation set forth in paragraphs 1 through 94 above as if fully set forth herein.

96. Famoyin operated a fraudulent scheme through McLeod Cancer Center whereby misbranded unapproved drugs were shipped to McLeod Cancer Center and such drugs were administered to patients and claims for reimbursement were submitted to Medicare, TennCare, and other health benefits programs.

97. McLeod Cancer Center was used by Famoyin as a mere instrumentality to conduct and conceal his illegal and fraudulent activities.

98. On information and belief, McLeod Cancer Center was 100% owned and managed by Kincaid, Lamb, and Famoyin, each of whom participated in the illegal and fraudulent activities through McLeod Cancer Center.

99. On information and belief, McLeod Cancer Center is the "alter ego" of Famoyin and was used in all respects by Famoyin as a shield for his debts and illegal and fraudulent activities.

100. On information and belief, Defendants Kincaid, Lamb, and Famoyin exercised complete control and domination over McLeod Cancer Center, including its finances, policies, and business practices, to such an extent that McLeod Cancer Center did not have a separate existence of its own.

101. On information and belief, Defendants Kincaid, Lamb, and Famoyin and McLeod Cancer Center intermingled funds and assets.

102. On information and belief, McLeod Cancer Center was inadequately capitalized.

103. On information and belief, corporate formalities were not observed by Defendants Kincaid, Lamb and Famoyin.

104. In Famoyin's role as a minority owner of McLeod Cancer Center, he used and abused the corporate form for his own personal benefit.

105. PHD was damaged by Famoyin as the illegal and fraudulent activities of Famoyin, including but not limited to the Fraudulent Scheme, which directly or indirectly caused the closure of McLeod Cancer Center, the fines levied against McLeod Cancer Center and its members, and the failure of McLeod Cancer Center to pay its obligations due under the Agreement.

106. The assets of Famoyin should be considered one and the same with McLeod Cancer Center and Famoyin should be liable to PHD for McLeod Cancer Center's obligations arising from the Agreement.

**WHEREFORE**, Plaintiffs, Express Scripts, Inc. and Priority Healthcare Distribution, Inc. d/b/a CuraScript SD Specialty Distribution, demand judgment as follows:

a) Under Count I, finding Defendant Kincaid to be a mere instrumentality and alter ego of East Tennessee Hematology Oncology Associates P.C. d/b/a McLeod Cancer and Blood

Center and awarding the Plaintiffs a judgment against East Tennessee Hematology Oncology Associates P.C. d/b/a McLeod Cancer and Blood Center in a sum equal to or greater than $5,381,766.53, plus interest, fees and costs, including reasonable attorneys' fees;

      b)    Under Count II, finding Defendant Lamb to be a mere instrumentality and alter ego of East Tennessee Hematology Oncology Associates P.C. d/b/a McLeod Cancer and Blood Center and awarding the Plaintiffs a judgment against East Tennessee Hematology Oncology Associates P.C. d/b/a McLeod Cancer and Blood Center in a sum equal to or greater than $5,381,766.53 plus interest, fees and costs, including reasonable attorneys' fees;

      c)    Under Count III, finding Defendant Famoyin to be a mere instrumentality and alter ego of East Tennessee Hematology Oncology Associates P.C. d/b/a McLeod Cancer and Blood Center and awarding the Plaintiffs a judgment against East Tennessee Hematology Oncology Associates P.C. d/b/a McLeod Cancer and Blood Center in a sum equal to or greater than $5,381,766.53, plus interest, fees and costs, including reasonable attorneys' fees; and

      d)    Granting such other and further relief as the Court deems just and proper.

This the 9th day of January, 2019.

                            HUSCH BLACKWELL LLP

                    By:   */s/Samantha A. Lunn*
                           Samantha A. Lunn, TN BPR # 030473
                           736 Georgia Avenue, Suite 300
                           Chattanooga, Tennessee 37402
                           Telephone: (423) 755-2654
                           Facsimile: (423) 266-5499
                           Email: Samantha.Lunn@huschblackwell.com

                           ***Attorneys for Plaintiffs Express Scripts, Inc. and Priority Healthcare Distribution, Inc., d/b/a CuraScript SD Specialty Distribution***