UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF TENNESSEE
AT CHATTANOOGA

| | |
|---|---|
| EXPRESS SCRIPTS, INC., *et al.*, | ) |
| | ) |
| Plaintiffs, | ) |
| | ) |
| v. | ) CASE NO. 1:19-cv-00007-SKL |
| | ) |
| WILLIAM R. KINCAID, M.D., *et al.*, | ) |
| | ) |
| Defendants. | ) |

**MEMORANDUM AND ORDER**

On April 23, 2020, the Court entered a Memorandum and Order [Doc. 98] dismissing Defendants Charles Famoyin, M.D. ("Famoyin"), and Millard Lamb, M.D. ("Lamb"), on their motions for summary judgment. The Court denied summary judgment as to Defendant William Kincaid, M.D. ("Kincaid" and collectively, "Defendants"). Currently before the Court is Kincaid's Motion for Reconsideration of his Motion for Final Summary Judgment [Doc. 104]. Kincaid also filed a Notice of Supplemental Authority [Doc. 105]. Plaintiffs Express Scripts, Inc., and CuraScript SD Specialty Distribution[1] ("Express Scripts," "CuraScript," and collectively, "Plaintiffs") filed a response in opposition [Doc. 106]. Kincaid did not file a reply, and the time for doing so has passed. E.D. Tenn. L.R. 7.1. No party requested a hearing on the motion, and the Court finds a hearing is not necessary. This matter is now ripe. For the reasons discussed below, the motion for reconsideration will be denied.

---

[1] CuraScript SD Specialty Distribution is the d/b/a moniker for Plaintiff Priority Healthcare Distribution, Inc. The Court uses "CuraScript" herein.

## I. BACKGROUND

The background facts of this case are set forth in detail in the Court's Memorandum and Order on the motions for summary judgment [Doc. 98]. They will only be repeated to the extent necessary to address the instant motion for reconsideration.

This is a piercing the corporate veil/alter ego case. Kincaid, along with Lamb and Famoyin, operated the now-closed McLeod Cancer Center, P.C. ("McLeod"), in Johnson City, Tennessee. All three Defendants worked as doctors at McLeod. Michael Combs was the business manager at McLeod at all relevant times. Combs is not a party to this case, but he did play a significant role in the events underlying Plaintiffs' veil piercing claims.

From Fall 2007 to the middle of 2008, and again from August 2009 to February 2012, McLeod, acting through Combs, purchased off-brand, non-FDA-approved drugs that were used on patients. The drugs were purchased from a Canadian company referred to as QSP. Health benefit programs were inappropriately billed for use of these off-brand drugs. In its 2007-08 phase, all three Defendants were aware of this arrangement, referred to by Plaintiffs and herein[2] as the "Fraudulent Scheme," but only Kincaid was aware of it during the second phase from 2009-2012. False Claims Act actions were filed against Defendants, which concluded with Kincaid owing $2.55 million. Kincaid was also charged criminally—on November 15, 2012, he pled guilty to one count of "receiving in interstate commerce a misbranded drug with intent to defraud or mislead in violation of 21 U.S.C. § 331(c)." [Doc. 1-3 at Page ID # 28].

In September 2011, McLeod, acting through Combs, executed a Credit Application (the "Agreement") with CuraScript to purchase FDA-approved prescription drugs. McLeod (again, acting through Combs) began ordering drugs from CuraScript in June 2012, and built up an unpaid

---

[2] The Court acknowledges this is Plaintiffs' characterization.

2

balance of nearly $2 million by October. On February 21, 2013, Plaintiffs filed suit for breach of the Agreement in a Florida state court. Plaintiffs obtained a judgment in the Florida court against McLeod, but not against Defendants. Plaintiffs then domesticated the judgment in Tennessee by filing suit in Washington County, Tennessee. On August 21, 2018, the Tennessee state court entered a Final Order of Default Judgment awarding Plaintiffs $5,136,142.03 (the amount of the Florida judgment), plus "accrued post-judgment interest" [Doc. 8]. Plaintiffs have been unable to collect from McLeod, and have pursued Defendants in the instant action, which they filed January 9, 2019.

Famoyin filed a motion for summary judgment on February 25, 2020 [Doc. 73 & Doc. 74]. Lamb filed a notice of joinder in Famoyin's motion that same day [Doc. 75], and Kincaid late-filed a notice of joinder two days later [Doc. 76].[3] Following a brief introduction, Kincaid's "joinder" provides in its entirety:

> Like Defendants Famoyin and Lamb, Defendant Kincaid did not see the [Agreement] with CuraScript prior to the original lawsuit being filed against McLeod Cancer Center. As a physician, defendant Lamb did not actually administer the drugs to the patients, as this was the nurses' role. Dr. Kincaid did not find the supplier of medication and did not say anything about QSP.
>
> Moreover, the [Agreement] at issue was signed by Michael Combs as authorized agent, utilizing Dr. Lamb's DEA number. The [Agreement] was not signed by Dr. Kincaid. And, the doctors did not know who they were buying drugs from and would have to ask. Further, Mike Combs purchased the drugs from QSP, not Dr. Kincaid. Of equal importance, Dr. Kincaid had no knowledge of

---

[3] As Plaintiffs point out, motions for summary judgment were due February 25, 2020 [Doc. 38]; accordingly, Kincaid's so-called joinder was untimely. Moreover, the Court notes Rule 10(c) only permits parties to adopt, by reference, statements made in *pleadings*, not other motions. Fed. R. Civ. P. 10(c); *see also* Wright & Miller, 5A Wright & Miller, Fed. Prac. & Proc. Civ. § 1326 (4th ed. April 2020 update) ("Rule 10(c) does not contemplate the incorporation of statements from prior motions."). Accordingly, Kincaid's incorporation of Famoyin's arguments for summary judgment was improper. The Court nevertheless considered Kincaid's joinder in its summary judgment ruling.

3

> CuraScript SD by which to intend to defraud them, as has been alleged by plaintiff. In addition, Kincaid had never seen the credit application for CuraScript, under which the claims for relief filed by Plaintiff are based. The same was true for Express Scripts, Inc., Dr. Kincaid lacked any knowledge and had no knowledge that Combs had signed the credit application on behalf of McLeod.
>
> For all of the reasons stated in defendant Famoyin's Motion for Summary Judgment and Memorandum of Law in Support thereof, and as joined by Defendant Lamb, and as further set forth above, the Court should enter an Order granting Summary Judgment in Defendant Kincaid's favor, and dismiss the Complaint against Defendant Kincaid on the basis that there is no genuine issue as to any material fact that he did not commit any fraud upon either Plaintiff that could form the basis of any claim against him under a theory of piercing the corporate veil or under an alter ego theory and he is thus entitled to a judgment as a matter of law.

[Doc. 76 at Page ID # 587 (citations to record omitted)].

Plaintiffs filed a response in opposition to the motions for summary judgment [Doc. 86]. Famoyin is the only defendant to file a reply [Doc. 90]. The Court then ordered supplemental briefing on the issue of res judicata. Once again, Famoyin filed a brief addressing the issue, and Lamb and Kincaid each filed a notice of joinder as to Famoyin's brief [Doc. 94 & Doc. 95].

On April 23, 2020, the Court entered a Memorandum and Order addressing summary judgment. The Court applied Tennessee law on piercing the corporate veil, because this is a diversity case, and because the parties cited only Tennessee law on that issue.[4]

Applying Tennessee law, the Court concluded there were questions of fact regarding whether Kincaid should be personally liable for McLeod's debts to Plaintiffs under a corporate veil piercing theory, but that the claims against Lamb and Famoyin should be dismissed. The Court distinguished Kincaid from the others primarily due to questions of fact about his knowledge

---

[4] The Court specifically noted that the "parties cite Tennessee law in support of their arguments [regarding piercing the corporate veil], and no party took the position that the substantive law of any other state applies with respect to the veil piercing issues." [Doc. 98 at Page ID # 1046, n.4].

4

and participation in the second phase of the Fraudulent Scheme.

Kincaid, in the instant motion, argues the Court should have also granted summary judgment as to the claims against him. He argues, first, that the Court erred by not applying Florida substantive law regarding piercing the corporate veil. The primary basis for his argument appears to be language in the Agreement providing:

> The undersigned agrees that: (1) this agreement shall be deemed fully executed and preformed [sic] in the State of Florida and shall be governed by and construed in accordance with the laws thereof; (2) in any action, proceeding, or appeal of any matter relating to or arising out of this judgment, the undersigned shall be subject to jurisdiction of the State of Florida and accept venue in Seminole County, Florida; and (3) the undersigned expressly waives any right to a trial by jury. The undersigned agrees to reimburse CSD[5] for any attorney fees, court costs or collection agency fees CSD may incur in its efforts to collect any past-due amounts.

[Doc. 1-1 at Page ID # 20]. He also points out the original judgment against McLeod was entered in Florida.

Kincaid further argues the Court erred in finding there are material disputed facts regarding whether the veil should be pierced as to Kincaid.

## II. STANDARDS

### A. Rule 54(b)

Federal Rule of Civil Procedure 54(b) provides:

> [A]ny order or other decision, however designated, that adjudicates fewer than all the claims or the rights and liabilities of fewer than all the parties does not end the action as to any of the claims or parties and may be revised at any time before the entry of a judgment adjudicating all the claims and all the parties' rights and liabilities.

"District courts have authority under both common law and Rule 54(b) to reconsider

---

[5] CuraScript

interlocutory orders and to reopen any part of a case before entry of final judgment." *Rodriguez v. Tenn. Laborers Health & Welfare Fund*, 89 Fed. App'x 949, 959 (6th Cir. 2004) (citation omitted). "Traditionally, courts will find justification for reconsidering interlocutory orders when there is (1) an intervening change of controlling law; (2) new evidence available; or (3) a need to correct a clear error or prevent manifest injustice." *Id.* (citation omitted). The standard "obviously vests significant discretion in district courts," *id.* at 959 n.7, and "allows district courts to afford such relief from interlocutory orders as justice requires." *Id.* (internal brackets, quotation marks and citations omitted). Nevertheless, motions to reconsider should be "used sparingly and in rare circumstances." *Grogg v. Clark*, No. 2:15-CV-298-JRG-MCLC, 2016 WL 1394534, at *1 (E.D. Tenn. Apr. 7, 2016).

    **B.**    **Summary Judgment**

Summary judgment under Rule 56 of the Federal Rules of Civil Procedure is proper "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). A "material" fact is one that *matters*—i.e., a fact that, if found to be true, might "affect the outcome" of the litigation. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). A "genuine" dispute exists with respect to a material fact when the evidence would enable a reasonable jury to find for the non-moving party. *Id.*; *Jones v. Sandusky Cty., Ohio*, 541 F. App'x 653, 659 (6th Cir. 2013); *Nat'l Satellite Sports, Inc. v. Eliadis Inc.*, 253 F.3d 900, 907 (6th Cir. 2001). In determining whether a dispute is "genuine," the court cannot weigh the evidence or determine the truth of any matter in dispute. *Anderson*, 477 U.S. at 249. Instead, the court must view the facts and all inferences that can be drawn from those facts in the light most favorable to the non-moving party. *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986); *Nat'l Satellite Sports*, 253 F.3d at 907.

The moving party bears the initial burden of establishing that no genuine issues of material fact exist. *Celotex Corp. v. Catrett*, 477 U.S. 317, 330 n.2 (1986). To refute such a showing, the non-moving party must present some significant, probative evidence indicating the necessity of a trial for resolving a material, factual dispute. *Id.*, 477 U.S. at 323. A mere scintilla of evidence is not enough. *Anderson*, 477 U.S. at 252; *McLean v. 988011 Ontario, Ltd.*, 224 F.3d 797, 800 (6th Cir. 2000). The court's role is limited to determining whether the case contains sufficient evidence from which a jury could reasonably find for the non-moving party. *Anderson*, 477 U.S. at 248, 249; *Nat'l Satellite Sports*, 253 F.3d at 907.

## III. ANALYSIS

The Court will not revisit, at this time, whether Florida substantive law on piercing the corporate veil applies. Kincaid had ample opportunity to raise the issue at the summary judgment stage and he failed to do so. As Plaintiffs point out, not only did Kincaid fail to raise the issue when he had the opportunity to do so, he explicitly adopted the arguments of Famoyin, who cited Tennessee law. *See Madden v. City of Chattanooga*, No. 1:08-cv-160, 2010 WL 670107, at *2 (E.D. Tenn. Feb. 19, 2010) ("A motion to reconsider under Rule 54(b) . . . may not 'serve as a vehicle to identify facts or raise legal arguments which could have been, but were not, raised or adduced during the pendency of the motion of which reconsideration was sought.'" (quoting *Grozdanich v. Leisure Hills Health Ctr., Inc.*, 48 F. Supp. 2d 885, 888 (D. Minn. 1999))). Moreover, the Court was not required to analyze an unasserted choice of law question *sua sponte*. *See GBJ Corp. v. E. Ohio Paving Co.*, 139 F.3d 1080, 1085 (6th Cir. 1998) (citation omitted).[6]

---

[6] If the parties persist in their disagreement about issues such as which state's substantive law applies, whether the application of Florida vs. Tennessee law makes a difference on the issue of veil piercing, and/or whether Kincaid has waived his ability to rely on Florida law, the parties should be prepared to address such issues and their respective positions with supporting authority at trial.

The Court further finds Kincaid has failed to show reconsideration of the Court's Memorandum and Order on summary judgment is justified based on his characterization of the facts.[7] First, he argues: "No proof was presented to the Court that McLeod declined due to the federal investigation, and, that due to this decline, was unable to meet its obligations to Curascript." [Doc. 104 at Page ID # 1085]. He contends that the Court "has made a giant leap in its assumption that McLeod could not afford its obligations to Curascript or, that any federal investigation caused any business damage." [*Id.* at Page ID # 1086].

Contrary to Kincaid's argument, Lamb testified in his deposition that the "allegations raised by the Federal government" "doomed the practice because of what had transpired," and that the "charges brought . . . caused the practice to evaporate." [Doc. 86-9 at Page ID # 729]. The timing of the saga also lends some support to Plaintiffs' theory that the drugs were purchased from Plaintiffs with no intention of being paid for. That is, the chain of events may support a connection between the federal investigation, the shuttering of the practice, and McLeod's failure to pay Plaintiffs' invoices: the Fraudulent Scheme seems to have ended around February 2012 following the federal search of McLeod's offices;[8] McLeod ordered drugs from Plaintiffs from June through October 2012, and by the end McLeod owed Plaintiffs nearly $2 million; in November 2012,

---

[7] Kincaid mostly focuses on the application of his version of the facts to Florida law on piercing the corporate veil. *See* Doc. 104 at Page ID # 1084 ("[T]here is no proof before this Court to satisfy the government law of *Riley* [*v. Fatt*, 47 So.2d 769 (Fla. 1950)]"). Nevertheless, the Court will briefly address the factual issues raised by Kincaid.

[8] Without citation to the record, Kincaid argues the "purchasing of mislabeled drugs . . . had occurred and stopped in October, 2011, as set forth in Dr. Kincaid's plea agreement" [Doc. 104 at Page ID # 1084]. At least at one point, the plea agreement indicates McLeod "obtained misbranded unapproved drugs . . . from September 2007 to early 2008 **and from August 2009 to February 2012**" [Doc. 1-3 at Page ID # 33 (emphasis added)]. Regardless, the Court acknowledges the purchases from CuraScript did not overlap in time with the Fraudulent Scheme. The Court finds this is not dispositive of the motion for reconsideration.

Kincaid pled guilty to the related criminal charges.[9] According to the motion for reconsideration, Kincaid resigned in October 2012, McLeod stopped taking patients in November 2012, and McLeod "shut down" in February 2013 [Doc. 104 at Page ID # 1083, n.1].[10]

Next, Kincaid argues:

> The Court has suggested in support of the McLeod failure theory, that perhaps Kincaid may have improperly received corporate assets in 2011. **However, the only facts supporting this theory, is that both Lamb and Kincaid received assets of McLeod in 2011**, however, there are no facts before this Court to suggest what assets, how much in assets, whether the transfer of those assets were received improperly, or, whether the transfer of those assets even impacted the financial status of McLeod into 2012.

[*Id.* at Page ID # 1086 (emphasis added)]. These may very well be disputed facts; and perhaps will assist Kincaid in defending against Plaintiffs' veil piercing claim. Nevertheless, as the bolded language shows, Kincaid admits he received assets during a time when McLeod, allegedly with Kincaid's knowledge and consent, was participating in the Fraudulent Scheme.

Relatedly, Kincaid argues that the "Court has improperly labeled Kincaid's salary as 'substantial' when there are no facts in the record to support this, and, has misstated relevant facts." [Doc. 104 at Page ID # 1087]. The Court found there was "a question of fact regarding the propriety of Kincaid's acceptance of a substantial salary and advances in 2011, during a time when he knew McLeod was participating in the Fraudulent Scheme [Doc. 98 at Page ID # 1056].

---

[9] In their complaint, Plaintiffs contend Combs pled guilty to criminal charges related to the Fraudulent Scheme in August 2012 [Doc. 1 at Page ID # 8, ¶ 48].

[10] In support of his claim that the practice shut down in 2013, Kincaid cites a page from his deposition which the Court was unable to find in the record. In the previous Memorandum and Order, the Court found the practice shut down in 2012 [Doc. 98 at Page ID # 1051], which is supported by Famoyin's testimony that McLeod "ceased doing business . . . around October-November 2012." [Doc. 73-1 at Page ID # 517]. Regardless the Court finds this possible error does not warrant reconsideration.

Admittedly, with the exclusion of the accounting report (at least for summary judgment purposes) discussed in the Court's prior order, there is no proof from Plaintiffs as to the actual amount of Kincaid's salary. Nevertheless, as the Court noted for purposes of excluding the report from summary judgment consideration, Kincaid had not disputed that he received corporate assets from McLeod during the second phase of the Fraudulent Scheme as argued by Plaintiffs [*see* Doc. 98 at Page ID # 1051-52]. The amount of his salary and other compensation during the Fraudulent Scheme is not dispositive of the motion for summary judgment or the motion for reconsideration; neither is the timing of Kincaid's alleged receipt of corporate assets vis-à-vis the timing of the purchases from Plaintiffs. Rather, the diversion of corporate assets, if any, is merely one of the *Allen* factors the Court discussed in its prior Memorandum and Order [Doc. 98 (citing *FDIC v. Allen*, 584 F. Supp. 386, 397 (E.D. Tenn. 1984)]; *see also, e.g., Pamperin v. Streamline Mfg., Inc.*, 276 S.W.3d 428, (Tenn. Ct. App. 2008) ("Because Streamline's assets were diverted to Mr. Holt's own personal use, Streamline became unable to fulfill its . . . obligations to creditors and others. It would be unjust, in our opinion, to allow Mr. Holt to hide behind an insolvent and defunct corporation . . . .").

Next, Kincaid argues: "No facts have been presented to this Court to suggest Kincaid knew he participated in the illegal purchase of misbranded drugs until such time as he entered his plea. In fact, testimony indicates to the contrary, that Kincaid believed he was not breaking the law, due to his attorney's opinion letter." [Doc. 104 at Page ID # 1087]. First, Kincaid does not include a citation to the record where this particular letter was discussed, nor did Defendants' original summary judgment filings include the letter. It was instead attached to Plaintiffs' response [Doc. 86-5].[11]

---

[11] The Court acknowledges Kincaid testified about the letter in his deposition, indicating his

Moreover, by referencing the letter, it appears Kincaid is implicitly acknowledging there are disputed facts regarding his knowledge. In the letter, which was written to Kincaid, Lamb, and Combs in 2008, the attorney "addresses . . . concerns that you are breaking federal law by importing foreign prescription drugs for use in the United States." [Doc. 86-5 at Page ID # 686]. The letter notes that the Federal Food, Drug, and Cosmetic Act "prevents the importation of any food, drug, device or cosmetic product that is adulterated, misbranded or counterfeit," and "prohibits anyone except the drug's original manufacturer to re-import a prescription drug in to the United States that was manufactured in the U.S." [*Id.*]. The letter also notes the Food and Drug Administration ("FDA") has discretion to enforce its policies, and its then-current policy (in 2008) was to "allow[] entry of foreign drugs by U.S. citizens who bring prescription drugs from foreign counties for personal use" and that the FDA "has not enforced the law against seven states," not including Tennessee, "and a dozen cities that have begun their own importation of drugs policy from Canada to their residents." [*Id.* at Page ID # 687]. The letter concludes that, although McLeod was importing the drugs to Tennessee, and not for Defendants' personal use, "a technical violation <u>may</u> exist but the advantages to patients and your ability to continue the deliver[y] of quality medical care would demonstrate no legitimate claim that could withstand scrutiny." [*Id.* at Page ID # 688 (emphasis in original)].

Notably, while the letter addresses importing drugs, it does not address the subsequent intermingling of the imported drugs with non-imported drugs for patient administration or requesting Medicare reimbursements for the imported drugs. As the plea agreement notes:

> The Medicare program, along with other government health benefits programs (to include TennCare, Tennessee's Medicaid

---

"takeaway" from reading the letter was that purchasing drugs from QSP was an "okay legal thing to do." [Doc. 86-3 at Page ID # 667]. The excerpt of this particular deposition testimony was also attached to Plaintiffs' response, not to Defendants' filings.

11

> program, and the Federal Employees Health Benefits Plan) provide reimbursement only for FDA-approved drugs, and a physician or health care provider submitting a claim for reimbursement for a covered drug represents that the drug administered or dispensed was an FDA-approved drug.

[Doc. 1-3 at Page ID # 32]. The plea agreement further notes McLeod purchased "over $2 million in misbranded unapproved drugs, providing those drugs to their patients, and billing Medicare, TennCare, and other government health benefits programs approximately $2.5 million for the unapproved drugs." [*Id.* at Page ID # 33]. Kincaid further fails to address the proof Plaintiffs produced regarding whether Kincaid actively concealed the second phase of the Fraudulent Scheme.

Kincaid also attempts to distinguish this case from *VP Buildings v. Polygon Group, Inc.*, No. M2001-00613-COA-R3-CV, 2002 WL 15634 (Tenn. Ct. App. Jan. 8, 2002), which the Court cited in its Memorandum and Order [Doc. 98] on the motions for summary judgment. But the Court likewise cited the case to distinguish it from the current case, as part of the basis for dismissing Lamb and Famoyin [*see id.* at Page ID # 1053-54]. This argument is unavailing.

In sum, the Court finds Kincaid has failed to show that denial of summary judgment as to him is manifestly unjust, or that this is the rare case where justice requires the Court to revisit its earlier determination.

## IV. CONCLUSION

For the reasons stated above, Kincaid's motion for reconsideration [Doc. 104] is **DENIED**. Further, Kincaid has twice been ordered to submit proposed findings of fact and conclusions of law for the trial of this case [Doc. 38 & Doc. 101]. His last deadline for doing so was May 14, 2020, when the Court noted that his failure to do so "**will result in sanctions up to and including entry of default judgment for failure to comply with the Court's orders**." [Doc. 101 at Page

ID # 1070 (emphasis in original)]. Kincaid has still not submitted the proposed findings of fact and conclusions of law. Perhaps he believed filing the motion for reconsideration suspended that deadline—it did not. Kincaid is therefore **ORDERED** to submit his proposed findings of fact and conclusions of law within **SEVEN DAYS** of entry of this Order.[12] Should he fail to do so again, sanctions up to and including entry of default judgment will be entered without further notice.

SO ORDERED.

ENTER:

s/ *Susan K. Lee*
SUSAN K. LEE
UNITED STATES MAGISTRATE JUDGE

---

[12] Proposed findings of facts shall contain a jurisdictional statement, identify the parties, and set out the facts in the chronological order the particular party intends to prove at trial. Conclusions of law should be concise with appropriate citations of authority pursuant to Local Rule 7.4. Conclusions of law should not be argumentative. A copy of the prepared proposed findings of fact and conclusions of law should be sent as an electronic mail attachment to lee_chambers@tned.uscourts.gov.